JAMES W. MIDGLEY
1014 D STREET, N.E.
WASHINGTON, D.C. 20002
D.C. BAR NO. 50039
TELEPHONE: (202) 607-6313
E-MAIL: JIM@MIDGLEY.NET
   Plaintiff in Pro Per

FILED

NOV 2 3 2001



UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMES W. MIDGLEY<br>1014 D STREET, N.E.<br>WASHINGTON, D.C. 20002<br>202-607-6313<br>           Plaintiff,<br><br>vs.<br><br>XELAN, INC.; XELAN LAW FIRM, LLP<br>AND DAVID C. JACQUOT<br>401 WEST A STREET<br>SAN DIEGO, CALIFORNIA 92101<br><br>           Defendants. | CASE NUMBER 1:01CV02430<br>JUDGE: James Robertson<br>DECK TYPE: Employment Discrimination<br>DATE STAMP: 11/23/2001<br><br>ECF<br>JURY ACTION<br><br>(Jury Trial Demanded) |

COMPLAINT

1. This case involves a District of Columbia resident, licensed to practice law in the District of Columbia and in the State of California, who was wrongfully induced to contract for employment and move to California by defendant David C. Jacquot ("Jacquot"), by means of Jacquot's intentionally false representations and promises that plaintiff's employment would be

1

full-time, permanent-type employment that could only be terminated for just cause. At the time Jacquot made such representations and promises, he was not licensed to practice law in California and he needed an experienced California bar member to litigate an important, pressing case confronting his California employer, defendant Xelan, Inc. ("Xelan"). After plaintiff moved to California and began work for Xelan, Jacquot learned that he had passed the California bar examination. Jacquot immediately became a member of the State Bar of California (not even waiting for the formal admission ceremony) and terminated plaintiff without warning, without just cause, and over the objection of Xelan's president who had described plaintiff's work product as "magnificent" and Jacquot's termination of plaintiff as "crazy." In terminating plaintiff, Jacquot even made the astonishing remark that since he had become a member of the State Bar of California, he could sign his own name to the complaint plaintiff had drafted in Xelan's important, pressing case. In fact, that is what Jacquot did a few days later and then promptly hired a less experienced lawyer as plaintiff's replacement. Jacquot's conduct toward plaintiff was intentional, malicious, extreme and outrageous, and as a result of such conduct plaintiff suffered great economic loss and severe emotional distress.

## PARTIES

2. Plaintiff is an individual who resides in the District of Columbia and who has resided in the District of Columbia at various times since 1971. Plaintiff was admitted to practice law in the District of Columbia in 1971 and in the State of California in 1988.

3. Xelan is a California corporation with its principal place of business in San Diego, California. Xelan, the self-described Economic Association of Health Professionals, is a financial services company that provides tax planning, retirement planning, insurance and

annuity planning, and asset protection services to thousands of physicians and dentists throughout the United States. These physicians and dentists are sometimes referred to by Xelan as "members."

4. Xelan operates its business through a nationwide network of about 60 Xelan "financial counselors" who provide Xelan's financial products and services to Xelan's doctor-members. According to Xelan's 2000 "Annual Review" that Jacquot furnished plaintiff on October 9, 2000, Xelan financial counselors have exclusive contracts with Xelan to provide Xelan's products and services to doctor-members and they receive compensation in the form of fees and commissions on financial products and services sold to doctor-members. Plaintiff is informed and believes that such exclusive contracts provide for the sharing of such fees and commissions with Xelan representing a major source of Xelan's business income. Xelan's 2000 Annual Review also indicates that there is a Xelan financial counselor located in Rockville, Maryland, from whose office, plaintiff is informed and believes, Xelan provides its products and services to its doctor-members in the Washington, D.C. area.

5. Xelan maintains an interactive Internet web site at http://www.xelan.com where it promotes its business and solicits doctors as members, including doctors in the District of Columbia. A copy of the principal, publicly-available web pages of Xelan's web site, exclusive of the introductory video, is attached hereto as Plaintiff's Exhibit "A." Xelan's web site offers to sell interested doctors annual "membership plans" for which doctor-members receive products and services from Xelan and from Xelan financial counselors. Such membership plans include a "financial analysis" by a Xelan financial counselor that evaluates a doctor's financial condition and recommends specific Xelan financial products and services. The membership plans offered at Xelan's web also site include access to the "Xelan Audit Defense Program," which, on

3

plaintiff's information and belief, offers legal services in defending doctor-members' tax deductions taken in following Xelan's tax-reduction programs. The Xelan web site also portrays a map of the United States depicting the locations of Xelan's financial counselors, which locations are referred to as Xelan's "offices."

6. Xelan's web site also includes testimonials from doctor-members who are described as Xelan's "satisfied customers." One such testimonial states: "During the years that I have followed Xelan's advice, I have saved at least $500,000 in income taxes and accumulated at least $1,000,000 more in saved money for retirement than I would have with the program my traditional advisors had me on."

7. Jacquot is an individual who resides either in the State of California or in the State of Idaho. According to a Xelan internal address list furnished plaintiff in November 2000, Jacquot resides in San Diego, California. According to current membership records of the State Bar of California, Jacquot represents himself to be a resident of Coeur D'Alene, Idaho. Plaintiff is informed and believes, and Xelan's web site states, that Jacquot is Xelan's Vice President and General Counsel.

8. Plaintiff is informed and believes that since before becoming Xelan's Vice President and General Counsel, Jacquot has maintained a private law practice in Idaho engaged in tax planning and asset protection planning. This private practice is conducted through an Idaho professional corporation called "David Jacquot, J.D., L.L.M. (Tax), P.A." According to records of the Idaho Secretary of State, Jacquot currently represents that his professional corporation's address as 14118 Wild West Place, Jamul, California.

9. Jacquot maintains an Internet web site called the "International Wealth Protection Homepage" (http://www.wealthdefense.com), at which he promotes his private practice to

potential clients, including potential clients in the District of Columbia. A copy of the principal web pages of Jacquot's web site is attached hereto as Plaintiff's Exhibit "B." The web site promotes offshore asset protect trusts as a means to protect assets "from the jurisdiction of the U.S. judicial system and its juries." Prior to becoming Xelan's Vice President and General Counsel, Jacquot also promoted his private practice as a speaker on asset protection trusts at doctor's financial planning seminars conducted by Xelan to attract new members.

10. Defendant Xelan Law Firm, LLP is an Idaho limited liability partership with its principal place of business in San Diego, California. According to records of the Idaho Secretary of State, Jacquot organized and registered Xelan Law Firm, LLP in the State of Idaho on September 25, 2000 and represented that the partnership's principal office was in Coeur D'Alene, Idaho. Plaintiff is informed and believes that Jacquot is the managing partner of Xelan Law Firm, LLP and that it is one of the Xelan "family of companies" advertised at Xelan's web site. At Xelan's web site, Xelan Law Firm, LLP advertises to doctor-members and potential doctor-members, including doctor-members and potential doctor-members in the District of Columbia, that its performs legal services relating to doctor benefit programs, incorporations, wills and trusts, litigation and tax audits.

## JURISDICTION AND VENUE

11. Jurisdiction is founded on 28 U.S.C. section 1332(a)(1), in that the matter in controversy, exclusive of interest and costs, exceeds the sum of $75,000 and is between citizens of different States. Jurisdiction is appropriate in the District of Columbia for the following reasons:

a). Under D.C. Code section 13-334, a foreign corporation doing business in the District of Columbia is subject to the general jurisdiction of District of Columbia courts. Defendants do business in the District of Columbia through their network of financial counselors and by soliciting business in the District of Columbia.

b). Under D.C. Code section 13-423(a)(1), a District of Columbia court may exercise jurisdiction over a person, acting directly or by an agent, as to any claim for relief arising from that person's transacting any business in the District of Columbia. As to the claims for relief asserted herein, defendants transacted business in the District of Columbia by soliciting plaintiff's employment through a District of Columbia Internet job listing service, contracting for plaintiff's employment in the District of Columbia, and inducing plaintiff to move from the District of Columbia to California for defendants' business purposes.

c). Under D.C. Code section 13-423(a)(4), a District of Columbia court may exercise jurisdiction over a person, acting directly or by an agent, as to any claim for relief arising from that person's causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia, if he regularly does or solicits business, engages in any persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia. As to the claims for relief asserted herein, defendants caused tortious injury to plaintiff in the District of Columbia by acts or omissions outside the District of Columbia pursuant to Jacquot's scheme to injure plaintiff as alleged herein.

d). Under the Fifth and Fourteenth Amendments to the United States Constitution, the defendants' business activities in the District of Columbia are sufficient to demonstrate that they purposefully availed themselves of the privilege of conducting activities here, and that they

enjoyed the benefits and protection of the laws here, such that they should reasonably anticipate being haled into court here.

12. Venue is appropriate under 28 U.S.C. section 1391(a)(2), in that a substantial part of the events or omissions giving rise to the claims for relief asserted herein occurred in the District of Columbia.

## FACTUAL BACKGROUND

13. In September 2000, defendants advertised for a "lead litigation attorney" for an organization referred to as Xelan Legal Services, PLLC through an Internet job listing service operated by Federal Reports Inc., a company located in the District of Columbia. Defendants' advertisement stated, among other things, that "[a]pplicants should be able to begin work as soon as possible (preferably on or before 15 October 2000)."

14. On September 22, 2000, plaintiff responded to defendants' advertisement by sending by facsimile from the District of Columbia a cover letter and resume addressed to Jacquot at Xelan Legal Services, PLLC. The cover letter stressed that plaintiff had been a litigation partner at Miller & Chevalier in Washington, D.C., the oldest tax law firm in the United States, and that plaintiff had substantial experience in the healthcare industry as a former outside counsel to the Blue Cross-Blue Shield health services system.

15. On September 29, 2000, Jacquot telephoned plaintiff in the District of Columbia and invited plaintiff to meet with him in San Diego, California. They agreed to meet in Jacquot's offices on Monday, October 9, 2000. In preparation for the meeting, plaintiff studied the Xelan web site and also sent Jacquot a follow-up letter by facsimile on October 6, 2000 with a series of questions plaintiff wanted to discuss with Jacquot at the meeting.

16. Plaintiff and Jacquot met in San Diego on October 9, 2000. From the outset of the meeting, it was clear that Jacquot was very eager for plaintiff to join Jacquot's legal organization. Jacquot and plaintiff reviewed a document Jacquot had prepared captioned "Xelan Law Firm, LLP," as the Xelan legal organization was then being called. Jacquot also went over the questions raised in plaintiff's October 6, 2000 letter.

17. In reviewing the "Xelan Law Firm, LLP" document, plaintiff expressed concern about the last page thereof relating to projected compensation. The projection was based on only 100 hours billed per month, which was only about one-half the number of billable hours per month plaintiff historically was accustomed to working. Plaintiff expressed concern whether there would be enough work to keep busy. Jacquot represented that there was a "huge" amount of work to do and he specifically referred to the so-called "viatical settlements" dispute that had become quite pressing and difficult for defendants to resolve amicably.

18. Jacquot and plaintiff also discussed what role Jacquot would play in litigated matters. Jacquot said he had little experience in civil litigation and would be pleased and relieved for plaintiff to handle litigation without Jacquot's day-to-day involvement.

19. Jacquot also said that in connection with his moving to California to become Xelan's Vice President and General Counsel, he had taken the Summer 2000 California bar examination. He also said that he had not adequately prepared for the examination and that he was sure he had failed. He even joked that his failing the Summer 2000 California bar examination gave plaintiff "job security" and that Jacquot would have to take off the months of January and February 2001 to prepare for the Winter 2001 California bar examination.

20. During their October 9, 2000 meeting, plaintiff told Jacquot that since plaintiff would be moving across the United States to an unfamiliar city, plaintiff could not undertake to accept

8

employment at Xelan unless the job would be a full-time, permanent-type position from which plaintiff would not be terminated except for just cause. Jacquot agreed and assured plaintiff that they would be "partners;" that Xelan needed a litigator with plaintiff's background and experience; that plaintiff was "the only qualified applicant" for the position; and that he and plaintiff would make a "lot of money together" over many years. Based on these representations and assurances, plaintiff agreed to pursue employment at Xelan on an expedited basis and meet with Xelan's Executive Vice President, Leslie S. Buck ("Buck").

21. On October 12, 2000, Jacquot telephoned plaintiff in the District of Columbia to set up a meeting between plaintiff and Buck. On October 15, 2000, plaintiff traveled from the District of Columbia to Buck's home in Queenstown, Maryland and met with Buck. During the meeting Buck said that Jacquot had advised him that plaintiff was the only qualified candidate for the lead litigation attorney position and that plaintiff was the most prepared of all the candidates interviewed. Buck also confirmed Jacquot's representations that there would be more than sufficient work for plaintiff to perform over the indefinite future.

22. On or about October 18, 2000, Jacquot again telephoned plaintiff in the District of Columbia. Jacquot stated that he had spoken with Buck and that they had agreed that plaintiff should join Xelan on the terms discussed in plaintiff's meeting with Jacquot on October 9, 2000. During their telephone conversation, plaintiff requested to be reimbursed his travel and relocation expenses. Jacquot offered to write plaintiff a check for a flat amount of $7,500 on plaintiff's first day of work, which plaintiff agreed to accept. They also agreed that plaintiff would accept Jacquot's offer of employment and would begin work on November 1, 2000.

23. As part of the scheme alleged herein, during their telephone conversation on or about October 18, 2000, Jacquot advised plaintiff that he had prepared a draft of the Xelan Law Firm,

9

LLP partnership agreement. Jacquot stated that it was "just a draft" that they could go over after plaintiff moved to California and then change as appropriate. Jacquot also stated that it would be appropriate for plaintiff to defer consideration of the draft partnership agreement until after moving to California in case plaintiff desired to consult with California counsel. Jacquot also stated that he wanted to send plaintiff a copy of the draft partnership agreement by electronic mail and he did so after their telephone conversation. In reliance on Jacquot's statements, plaintiff did not review the draft partnership agreement and did not sign it or even discuss it with Jacquot during plaintiff's employment at Xelan.

24. Prior to moving from the District of Columbia to California to begin employment at Xelan, plaintiff was offered employment as an attorney by the Legal Source company in the District of Columbia. Plaintiff declined the offer and advised the president of Legal Source that he had accepted a full-time, permanent position in California and that he was in process of packing and moving his possessions from the District of Columbia to California.

25. Plaintiff left the District of Columbia on October 30, 2000 and arrived in San Diego, California that evening. On October 31, 2000, plaintiff rented an apartment, opened a bank account, obtained a California driver's license upon surrendering his District of Columbia driver's license, and registered to vote in California. Later that week plaintiff purchased an automobile to drive in California after Jacquot signed a letter sent to the automobile dealer stating that plaintiff was employed by defendants and that based on plaintiff's working 2,000 billable hours per year, plaintiff's compensation was $192,500 per year.

26. Plaintiff began work at Xelan on November 1, 2000. Plaintiff began work on the so-called "viatical settlements" dispute in which some 86 Xelan doctor-members and Buck had invested about $13,132,482 to become irrevocable beneficiaries of terminally-ill individuals' life

insurance policies having a total face value $29,365,989. A trust called National Viatical Trust which held the insurance policies had defaulted on its trust duties and obligations, including its obligation to pay premiums on viaticated insurance policies, leaving the Xelan investors' investments in jeopardy. Jacquot asked plaintiff to investigate the facts and determine how and where a lawsuit could be brought to protect Xelan and the Xelan investors.

27. Plaintiff worked diligently on the viatical settlements dispute while an employee at Xelan. During the month of November 2000 plaintiff worked about 218 billable hours on the case in investigating the facts, researching applicable law and drafting a complaint for filing in the Superior Court of California for San Diego County. Plaintiff worked eagerly and cooperatively with Jacquot, Buck and Xelan's president, L. Donald Guess, DMD ("Guess") in protecting the legal rights of Xelan and the Xelan investors.

28. Over the weekend of November 18-19, 2000, the State Bar of California released the results of the Summer 2000 California bar examination and Jacquot learned that he had passed the bar examination. Beginning on November 20, 2000, Jacquot began to take charge of the viatical settlements case on which plaintiff was working. For example, on November 20, 2000 Jacquot called Xelan's former outside counsel, Bruce Wayne, and arranged a meeting for November 21, 2000 to discuss the possibility of requesting a court to appoint a receiver to administer viaticated insurance policies. Later that week Jacquot took upon himself to call persons who would be named as defendants in the complaint that plaintiff was drafting to announce that Xelan would be filing suit against them. Jacquot also sought and obtained, without plaintiff's prior knowledge, an agreement with counsel for a principal defendant in Florida, Donald Goldstein, to accept service of process for that defendant. After plaintiff advised Jacquot that jurisdiction in a California state court would be stronger if California residents were

named as individual plaintiffs, Jacquot and Guess undertook to find California doctor-investors who would be willing to become named plaintiffs by executing representation agreements prepared by Jacquot.

29. On November 30, 2000, plaintiff and Jacquot met to review proposed final changes to the draft complaint in the viatical settlements case. Jacquot asked plaintiff to give the draft to Guess after making the final changes, which plaintiff did about 1:00 p.m. At about 1:45 p.m., Guess came to plaintiff and described the draft complaint as "magnificent." Guess asked plaintiff whether the complaint could be filed that afternoon and plaintiff replied that filing the complaint that afternoon was not the plan but that plaintiff would call the copy service to inquire.

30. After calling the copy service, plaintiff returned towards Guess's office and found Guess, his secretary and Jacquot in the hallway. Jacquot screamed repeatedly at the top of his voice at plaintiff: "Who said you could file this complaint! Who said you could file this complaint!" Plaintiff replied, pointing to Guess, "He did. He asked me to call and see if it was possible to file the complaint today." Jacquot stormed away and went into his office.

31. Plaintiff was stunned and shaken by Jacquot's screaming at plaintiff. In a meeting later that day with a lawyer outside Xelan's offices, held to discuss procedures for obtaining preliminary relief in the viatical settlements case, plaintiff broke down in tears.

32. On December 1, 2000, plaintiff came to work at Xelan and went to Jacquot's office. Plaintiff told Jacquot that it was important that Jacquot and plaintiff act as a team, especially in front of Xelan's staff, and that plaintiff wanted to discuss about what happened the day before.

33. Jacquot asked plaintiff to sit at the conference table in his office and Jacquot asked another Xelan lawyer, who was present in the meeting the day before when plaintiff broke down in tears after Jacquot screamed at him, to participate in the meeting. Jacquot then told plaintiff

that "things just aren't working out" and that Jacquot wanted plaintiff to turn in his keys and leave Xelan by the end of the day. When plaintiff asked why things just weren't working out, Jacquot repeatedly stated that plaintiff "couldn't handle stress well" – an apparent reference to plaintiff's braking down in tears the day before after Jacquot screamed at plaintiff. Plaintiff asked to stay on at Xelan until Jacquot found a replacement for plaintiff, or until plaintiff found another job, but Jacquot refused. When plaintiff asked Jacquot how Jacquot expected plaintiff to find another job, Jacquot simply remarked that plaintiff should be able to find a job in San Diego's booming, high-technology economy. There was no discussion of any severance pay.

34. On December 2, 2000, plaintiff met with Guess in an effort to have Guess reverse Jacquot's termination of plaintiff. Guess said that Jacquot was "crazy" to terminate an experienced litigator just as Xelan was embarking on important litigation and he said he rejected Jacquot's position that Jacquot had the experience to handle the litigation without plaintiff. As for Jacquot's asserted justification for plaintiff's termination that plaintiff broke down in tears after Jacquot screamed at him, Guess said that he told Jacquot "so what . . . so he cried." However, Guess told plaintiff that he did not get involved in Xelan internal administration, which was Buck's responsibility, and that Guess would speak with Buck over the weekend. On December 4, 2000, Guess left a message for plaintiff that he had spoken with Buck who was not willing to overrule Jacquot and, therefore, plaintiff's termination was final.

35. Plaintiff sought to obtain other employment in California but was unable to do so as the California and national economies precipitously declined. In February 2001, plaintiff obtained temporary employment as a project attorney at $23 per hour in Washington, D.C. Subsequently plaintiff filed for bankruptcy protection. Plaintiff has continued to work on intermittent temporary projects while searching for permanent employment. However, after the

13

terrorist attacks of September 11, 2001, most such temporary projects have been canceled or deferred. As a result, plaintiff is presently unemployed and is receiving public assistance.

36. Plaintiff has suffered and continues to suffer severe and enduring emotional distress as a result of his termination of employment by defendants, including mental suffering and mental anguish manifested by extreme and unpleasant reactions such as grief, anxiety, shame, humiliation, embarrassment, indignity, anger, chagrin, disappointment, worry and nausea. The severity of plaintiff's emotional distress has intensified by plaintiff's present inability to provide any financial support for his minor children and by being declared "homeless" by the District of Columbia in connection with its approval of plaintiff's application for food stamps.

## FIRST CLAIM FOR RELIEF –

## FRAUD BY FALSE PROMISE AND INTENTIONAL MISREPRESENTATION

37. Plaintiff hereby incorporates by reference the allegations set forth in paragraphs 1 through 36, inclusive.

38. Jacquot falsely promised plaintiff and intentionally misrepresented to plaintiff that plaintiff's employment would be full-time, permanent-type employment terminable only for just cause. Jacquot made such false promises and intentional misrepresentations for the purpose of inducing plaintiff to relocate from the District of Columbia to California and accept employment at Xelan. Plaintiff justifiably relied on Jacquot's promises and representations by moving from the District of Columbia to California, by rejecting other employment and by making commitments in California such as leasing an apartment and purchasing an automobile. As a result of Jacquot's false promises and intentional misrepresentations, plaintiff sustained damage in losing his employment at Xelan and otherwise.

## SECOND CLAIM FOR RELIEF –

## VIOLATION OF CALIFORNIA LABOR CODE SECTIONS 970-972

39. Plaintiff hereby incorporates by reference the allegations set forth in paragraphs 1 through 38, inclusive.

40. Sections 970-972 of the California Labor Code impose criminal liability, and double damages in a civil action, for inducing a person to relocate to accept employment "through or by means of knowingly false representations . . . concerning . . . (b) The length of time such work will last. . . ." Jacquot represented to plaintiff that the employment offered plaintiff would be full-time, permanent-type employment terminable only for just cause when in fact Jacquot secretly intended such employment to last only until after Jacquot passed the California bar examination. As a result of Jacquot's knowingly false representations, plaintiff sustained damage for which defendants are liable in double damages.

## THIRD CLAIM FOR RELIEF –

## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

41. Plaintiff hereby incorporates by reference the allegations set forth in paragraphs 1 through 40, inclusive.

42. The public policy of the State of California, as expressed in California Labor Code section 970, condemns knowingly false representations to potential employees concerning the length of time their employment will last in order to induce relocation and employment. Compliance with California Labor Code section 970 is a duty imposed on all California employers in order to implement the fundamental public policies embodied in the State's penal

statutes. Defendants wrongfully and tortiously terminated plaintiff in violation of public policy and are liable in tort for plaintiff's damages caused thereby.

## FOURTH CLAIM FOR RELIEF –

## BREACH OF CONTRACT

43. Plaintiff hereby incorporates by reference the allegations set forth in paragraphs 1 through 42, inclusive.

44. In their telephone conversation on or about October 18, 2000, Jacquot offered plaintiff employment on the terms discussed in their meeting in San Diego on October 9, 2000, including that plaintiff's employment would be full-time, permanent-type employment terminable only for just cause. Plaintiff accepted Jacqout's offer of employment, thereby creating an enforceable contract of employment that Jacquot subsequently breached by terminating plaintiff without just cause. Defendants are liable in contract for plaintiff's damages caused by their breach of contract.

## FIFTH CLAIM FOR RELIEF –

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

45. Plaintiff hereby incorporates by reference the allegations set forth in paragraphs 1 through 44, inclusive.

46. Defendants' conduct in terminating plaintiff was extreme and outrageous. The extreme and outrageous character of Jacquot's conduct is confirmed by Jacquot's abuse of his position of authority over plaintiff as Vice President and General Counsel of Xelan and as managing partner of Xelan Law Firm, LLP. The partnership statute governing Xelan Law Firm, LLP imposes on Jacquot a fiduciary duty of care toward his partners of refraining from engaging

in negligent or reckless conduct, intentional misconduct, or a knowing violation of law. That statute also imposes on Jacquot an obligation to discharge his duties to the partnership and to other partners consistently with the obligation of good faith and fair dealing. Jacquot violated these statutory duties and obligations in conducting a deliberate scheme to defraud plaintiff which culminated in Jacquot's screaming at plaintiff in order to precipitate plaintiff's termination and the next day using the plaintiff's own emotional distress, that Jacquot himself intentionally and maliciously caused, as justification for terminating plaintiff.

47. The extreme and outrageous character of defendants' conduct is also confirmed by the fact that Jacquot knew when he terminated plaintiff on December 1, 2000 that plaintiff was particularly susceptible to emotional distress because plaintiff broke down in tears the day before after Jacquot screamed at him. Nevertheless, defendants proceeded in the face of such knowledge by terminating plaintiff and thereby causing plaintiff's severe and enduring emotional distress.

48. Defendants' infliction of plaintiff's emotional distress was intentional, malicious and reckless, in that plaintiff's emotional distress resulted from a deliberate scheme by Jacquot beginning in September 2000 or earlier, and that defendants proceeded in terminating plaintiff knowing that plaintiff's severe and enduring emotional distress was substantially certain to result from their intentional, malicious and reckless conduct.

## SIXTH CLAIM FOR RELIEF –

### PUNITIVE DAMAGES

49. Plaintiff hereby incorporates by reference the allegations set forth in paragraphs 1 through 48, inclusive.

50. Defendants, by their despicable conduct, acting with malice or reckless indifference to plaintiff's legal rights, are guilty of malice, oppression and fraud. Plaintiff is entitled to punitive damages against defendants for the sake of example and by way of punishment.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this matter on all issues triable by a jury.

WHEREFORE, plaintiff prays for judgment against all defendants in an amount to be proved at trial as actual and punitive damages, for plaintiff's attorneys' fees and other costs of suit, and for such other and further relief as this Court deems just and proper.

*/s/ James W. Midgley*
James W. Midgley
1014 D Street, N.E.
Washington, D.C. 20002
(202) 607-6313
   Plaintiff in Pro Per
DC Bar No. 50039

Dated: November 23, 2001